# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>    Plaintiff,<br>v.<br><br>ROYAL BANK OF CANADA,<br><br>    Defendant. | Civil Action No. 12 Civ. 2497 (AKH/KNE)<br><br><br>**RBC'S EDUCATIONAL BRIEF**<br><br>**ECF Case** |

## Table of Contents

I.      Introduction..................................................................................................... 1

II.     Affiliate Block Trading Is Lawful under CFTC Regulations and CFTC-
        Approved Exchange Rules.............................................................................. 3

III.    Block Trades between Separate Entity Affiliates Do Not Produce a Wash
        Result unless the Counterparties Were, in Reality, a Single Entity Trading with
        Itself. .............................................................................................................. 5

IV.     The Intent Necessary to Transform a Permissible Affiliate Block Trade into a
        Wash Sale Requires Proof that the Party In Fact Believed It Was Not
        Bargaining in Good Faith and Did Not Intend to Effect a Bona Fide Trade. ...................... 6

V.      The CFTC Incorrectly Suggests that an Intent to Eliminate Risk is the Proper
        Standard to Apply in this Case....................................................................... 7

VI.     Under *Stoller*, RBC's Lack of Notice Regarding the CFTC's Newly
        Articulated Prohibition on Affiliate Block Trades is a Valid Affirmative
        Defense. .......................................................................................................... 9

        A.      *Stoller* Provides a Valid Affirmative Defense. ...................................... 9

        B.      *Stoller* Is Not Distinguishable.............................................................. 11

VII.    The CFTC's 2004 and 2008 Proposed Guidance is Relevant Both to the
        CFTC's Burden of Proof Regarding Intent and to RBC's Affirmative *Stoller*
        Defense. .......................................................................................................... 13

VIII.   The CFTC's Fictitious Trading Claim Depends Entirely on its Wash Sale
        Theory. ............................................................................................................ 16

IX.     The Supreme Court's Decision in *Gabelli* Means that No Discovery Rule
        Tolled the Statute of Limitations on the CFTC's False Statement Claim. ...................... 17

X.      Conclusion ...................................................................................................... 17

## I.      Introduction.

Per the Court's request, this educational brief addresses some key legal issues regarding RBC's trading of Single Stock Futures ("SSF") and Narrow Based Index Futures ("NBI").  The counterparties to the block trades at issue in this case were, on the one hand, RBC, and, on the other hand, one of two separate legal entities that are affiliates of RBC.  RBC, from a Toronto trading desk, traded NBI contracts with its indirect subsidiary, a London bank.  RBC's Bahamas branch trading desk traded SSF contracts with another indirect subsidiary, a Luxembourg-domiciled broker-dealer with operations in New York.  All the trades were executed on the OneChicago Exchange pursuant to exchange rules that permitted parties to negotiate the terms of a block trade and then submit the trade for clearing and reporting at the exchange.  Each counterparty to the trades had its own independent economic reasons for engaging in each trade, each counterparty was subject to its own financial reporting, regulatory, and tax laws and regulations, and each counterparty properly observed all required corporate formalities, such as holding duly constituted board meetings and the like.

The CFTC contends that the SSF and NBI trades were all wash sales because it alleges that, despite the separate legal entities involved, RBC "in reality" traded with itself.  RBC, of course, denies that it traded with itself, and those facts will have to be resolved at another time.  In this brief, RBC responds to the CFTC's educational brief, which just assumes that RBC traded with itself, and sets forth an analysis of the law that applies in the true context of the case.  That is, this brief explains the legal framework for determining when trading between corporate affiliates might be considered wash trades rather than the trades of independent entities.

RBC's block trades with affiliated entities were permissible because the counterparties of each trade were separate legal entities making independent trading decisions for legitimate, separate business purposes.  And each RBC affiliate intended to, and did, take on exposure to

market risk in the SSF or NBI contract, which it used to hedge the risk of separate short or long equity positions arising naturally in each entity's separate and independent business.  That is all that is required for affiliated legal entities not to run afoul of the wash sale statute, and RBC and its affiliates complied in every respect.

RBC even requested regulators at the Chicago Mercantile Exchange ("CME") and the OneChicago Exchange to review the proposed block trading before it was initiated in early 2005.  The regulators satisfied themselves that the RBC affiliates "engage in wholly different lines of business and that [the] trading strategies as well as direct management are distinct from each other."  (CME-RBC 165).[1]  Accordingly, the CME did not have "concerns about the wash trade issue" and informed RBC that it "did not believe that the trades violated OneChicago rules or anyone else's rules and, as a result, were okay to take place."  (3/30/2011 Wolff Tr. at 39:4-7, 47:18).

Following that initial regulatory approval, the CFTC also evaluated RBC's affiliate block trading later in 2005 after the trading had been ongoing for many months.  During discussions with the CFTC after that review, CME "believed that the CFTC staff were satisfied that these trades were in accordance with the applicable rules and considered the matter done at that point in time."  (3/30/2011 Wolff Tr. at 62:4-7).  OneChicago then closed its regulatory file on the matter, stating that CFTC personnel had "indicated that based on the information provided by RBC in its letters, [the CFTC] does not view the trading conducted by RBC to be violative of any rules or regulations."  (CME-ONE 0000001).  The CFTC allowed the CME and OneChicago to convey this determination to RBC (*see, e.g.*, Document # (406) from OneChicago production),

---

[1] Where background facts are used in RBC's discussion of the legal issues, RBC has supported those facts with citations to the record.  RBC has not attached the cited documents or testimony for purposes of this educational brief, but will provide them if requested by the Court.

and the block trading then continued unabated for approximately the next four years.  Deposition testimony confirms that the CFTC was aware of and able to monitor the RBC block trading for as long as it continued.  (*See* Shilts Tr. at 22:19-24:21, 39:1-41:14).  In fact, the CFTC even created a "team" of compliance and surveillance staff in Washington and Chicago specifically to review and monitor the RBC block trading for many months beginning in Fall 2005.  (Taylor Tr. at 22-26.)

 As discussed in the separate sections below, the applicable case law establishes that RBC's affiliate block trading did not produce a wash result and, in any event, was not engaged in with the requisite intent for a wash sale violation.  Further, the CFTC did not provide fair notice of new standards it is apparently attempting to impose in this case, which requires dismissal of the wash sale claim under the Second Circuit's *Stoller* decision.  Finally, the false statement claim in Count III is time-barred under the Supreme Court's decision in *Gabelli v. SEC,* 133 S.Ct. 1216, 1220 (2013), which was issued after this action was filed.

## II.    Affiliate Block Trading Is Lawful under CFTC Regulations and CFTC-Approved Exchange Rules.

The CFTC's educational brief, in RBC's view, avoids the central legal issue in this case. Rather than directly discuss the legal standard under which affiliate block trading might be found to constitute wash sales – a standard that has never been decided in a litigated context and for which there accordingly exists little precedent – the CFTC mostly quotes general phrases and concepts regarding wash sales selected primarily from administrative cases that have nothing to do with affiliate block trading.  The CFTC's legal discussion, thus, is incomplete and superficial.  Indeed, if one were to accept the CFTC's arguments at face value, the only conclusion to be reached is that block trading between affiliates is *never* permitted.  Yet that is simply not the law, as several CFTC witnesses have acknowledged.

3

Block trades – which are prearranged, non-competitive trades between two parties that are then submitted to and cleared on an exchange – are lawful, bona fide transactions under CFTC Regulation 1.38(a) and OneChicago Exchange ("OCX") Rule 417. Because block trading is prearranged, it is by definition noncompetitive, which has been acknowledged by CFTC witnesses in deposition, including by the former Director of the CFTC's Division of Market Oversight. (Shilts Tr. at 152:16-17 ("Q: Is block trading inherently noncompetitive?  A: Yes.")). Additionally, OCX Rule 417 did not prohibit, or impose any special requirements on, block trading between parties that are affiliated with each other. (OCX Rule 417(a)-(d)). In practice, OneChicago required that affiliate block trades be conducted either between separate entities or between accounts under separate control.[2]  (4/21/2014 Wolff Tr. at 15:9-20.)

The CFTC also stated that no "presumption of illegitimacy" should apply to affiliate block trades when it published proposed guidance on affiliate block trading. *Execution of Transactions: Regulation 1.38 and Guidance on Core Principle 9,* 69 Fed. Reg. 39880, 39883 (July 1, 2004). Further, in deposition testimony, CFTC witnesses concede that affiliate block trading may be conducted lawfully. (Fung Tr. at 107:1-9) ("Q: . . .  is there anything per se, as you understand it, violative of large offsetting positions on block trades among affiliated parties? [Objection]  A: As I explained, it can't be done per se – you have to look at the whole transaction."); (Shilts Tr. at 154:21-155:1) ("Q: Is affiliate block trading in your view a per se violation of Core Principle 9 or any other rule or law?  [Objection]  A: I don't believe that it is.").

The operative question in this case, then, is when might block trading between affiliated parties run afoul of the prohibition against wash trading, recognizing that block trading is inherently, and permissibly, non-competitive. As the CFTC admitted, it bears the burden of

---

[2] This is the same standard that was expressly stated in a rule applicable to another type of lawful noncompetitive trade known as an exchange of future for physical ("EFP") transaction. (OCX Rule 416).

proving both that a wash result occurred from the trades in question and that the parties acted with the required intent when engaging in the trades.

III.    **Block Trades between Separate Entity Affiliates Do Not Produce a Wash Result unless the Counterparties Were, in Reality, a Single Entity Trading with Itself.**

As a threshold matter, it bears repeating that Royal Bank of Canada, a Canadian bank, traded SSF contracts with its indirect subsidiary RBC Capital Markets Arbitrage, S.A., a Luxembourg broker-dealer, and traded NBI contracts with its indirect subsidiary RBC (Europe) Ltd., an English bank.  Trading records, other documentary evidence, and testimony all confirm this fact, which not even the CFTC contests.  (Am. Compl. ¶ 19).  The CFTC's Amended Complaint rests *entirely* on its conclusory allegation that RBC and the two separate legal entities with which RBC block-traded futures were, "in reality a single entity trading with itself."  (Am. Compl. ¶ 73).  That allegation – which is denied and must be proved – is the CFTC's *only* basis for concluding that the threshold element of a wash sale violation (a wash result) has occurred.[3] If the jury finds that Royal Bank of Canada is distinct from and not "in reality a single entity" with those subsidiaries, then the entire simplistic basis of the CFTC's case will have been disproven, requiring dismissal of the wash sale claim.

Adopting the "single entity trading with itself" premise, the CFTC invokes wash sale criteria and cites wholly inapplicable precedents that apply (and only make sense) where a single entity trades with itself.  In that context, a wash result arises from the purchase and a sale of a futures contract at the same price by *one* entity.  *Piasio v. CFTC,* CFTC Docket No. 97-9, 2000 WL 1466069 (Sept. 29, 2000) (finding a wash result where a single company purchased a future to show a profit in one financial reporting period and simultaneously sold the same future to

---

[3] Even were the CFTC to prove a wash result, the affiliated traders also must have an improper intent. (*See* Section IV *infra*).

show an offsetting loss in the next). Those facts produce a *per se* financial nullity in the futures positions, and RBC does not dispute that if a single entity traded with itself, that would produce a wash result. The CFTC does not cite a single case involving block trades, much less a case involving separate legal entities engaged in block trading, much less affiliated separate legal entities engaged in block trading. Notwithstanding the lack of precedent, the CFTC's educational brief does not even attempt to delineate what factors might establish that block trading between separate entities constitutes a wash result.

Whether RBC was, "in reality a single entity trading with itself" is a critical fact dispute in this case. It cannot be presumed. If RBC and its affiliates were not, in reality, a single entity trading with itself, the CFTC cannot show a wash result. And whether or not RBC and its affiliates were, in reality, a single entity trading with itself, the CFTC cannot oversimplify the intent element of its wash sale claim into a narrow inquiry about whether risk was negated or not.

## IV. The Intent Necessary to Transform a Permissible Affiliate Block Trade into a Wash Sale Requires Proof that the Party In Fact Believed It Was Not Bargaining in Good Faith and Did Not Intend to Effect a Bona Fide Trade.

Second Circuit law is clear that to establish an illegal wash sale the CFTC must prove that a party did not intend to enter into a bona fide trade. *Reddy v. CFTC*, 191 F.3d 109, 115 (2d Cir. 1999); *Transnor (Bermuda) Ltd. v. BP North Am. Petroleum*, 738 F. Supp. 1472, 1494 (S.D.N.Y. 1990). As the *Reddy* court noted, a transaction is not unlawful under Section 4c if "one *in fact* believes he is bargaining faithfully and intends to effect a bona fide trade." *Reddy*, 191 F.3d at 119 (emphasis added) (quoting *CFTC v. Savage*, 611 F.2d 270, 284 (9th Cir. 1979)). *Stoller* also confirms that the "essential and identifying characteristic of a wash sale seems to be the intent not to make a genuine, bona fide trading transaction." *Stoller v. CFTC*, 834 F.2d 262, 265 (2d Cir. 1987) (quotations and citations omitted).

6

In *Stoller*, there was no on-point precedent for the CFTC's position that "roll-forward" trading was illegal.  So, the CFTC attempted to rely on wash sale decisions arising in completely different contexts.  *Id.* at 264-66.  Stoller did not dispute that he had knowingly engaged in "roll-forward" trading, but he argued that he lacked notice (and therefore knowledge) that the CFTC considered it improper.  *Id.* at 266.  This lack of notice was relevant because the CFTC was required to prove that Stoller did not intend to enter into bona fide transactions.  That is, because Stoller could have "well believe[d]" roll-forward trading was "factually distinguishable from the Commission's prior case law," lack of notice was an "incurable defect" to the CFTC's case.  *Id.* at 265, 266.  Without notice that roll-forward trading was improper, Stoller could not have believed that he was bargaining unfaithfully for a wash transaction, rather than a bona fide trade.

## V.   The CFTC Incorrectly Suggests that an Intent to Eliminate Risk is the Proper Standard to Apply in this Case.

By continuing to rely on its "one entity trading with itself" premise, the CFTC does not fully address the proper application of the intent element required for its wash sale claim.  That is, the CFTC has repeatedly suggested that its burden to show intent is met merely if it proves RBC intended to eliminate either price competition or market risk.  (CFTC Br. at 2 (quoting *Piasio*, 2000 WL 1466069, at *11)).[4]  Once again, however, that framework assumes away the true crux of this case.  First, all block trades – whether between affiliates or wholly unrelated parties – by definition avoid price competition.  Thus, intent to avoid price competition cannot be the relevant intent in this context.  If it were, then all affiliate block trades would be per se unlawful, and no one has asserted that proposition.  Second, if it *assumed* that one entity is trading with itself, then by definition market risk is intentionally eliminated through any such

---

[4] Elsewhere, the CFTC relies on *Gimbel* for this proposition.  (CFTC Br. at 3 n.1).  The language in *Gimbel* cited by the CFTC discusses the *structural* elements of a fictitious transaction, not the intent requirement.  *In re Gimbel*, Comm. Fut. L. Rep. (CCH) ¶ 24,213 at 35,003 n.7 (April 14, 1988).

trading because that one entity is intentionally both long and short on the exact same position and any market movement affects each side of the trade in equal, offsetting amounts.

Moreover, even if RBC and its affiliates could be considered a single trader (under some unknown standard which the CFTC has chosen not to articulate), that would merely negate risk and produce a wash result.  It would not show that RBC and its affiliates *intended* to trade in a prohibited, unitary manner "to achieve a wash result in a manner that negated risk."  *Piasio*, 2000 WL 1466069, at *7.  The CFTC must prove that each RBC counterparty did not intend, in fact, to bargain faithfully and execute a bona fide, bilateral trade.  *See Reddy*, 191 F.3d at 119 (quoting *Savage*, 611 F.2d at 284).  Only if RBC and its affiliates were trading with the unified intent of a single entity could the CFTC satisfy the intent element of its wash sale claim that RBC was "in reality a single entity trading with itself."  By assuming away the key factual dispute in this case, the CFTC fails to address all requirements of the proper intent standard when separate affiliated entities are the counterparties to trades.

The teaching of *Reddy, Stoller* and *Savage* is applicable, but ignored by the CFTC.  Instead, the CFTC string cites to inapposite administrative cases.  While not binding on this Court, these administrative cases actually reconfirm *Reddy, Stoller,* and *Savage.*  For example, *Bear Stearns* holds that the CFTC needed (and failed) to show that the "respondent knew of the wrongful nature of the challenged trade at the time of his participation."  *In re Bear Stearns & Co.,* CFTC Docket No. 80-31, 1991 WL 83520, at *15 (Jan. 25, 1991).  The CFTC also relies on *Piasio*, an administrative case, but that case again confirms that avoiding risk does not fully define the applicable intent standard.  *Piasio*, 2000 WL 1466069.

In *Piasio*, a broker named Wilson executed two offsetting orders suspecting that one customer, rather than two, had initiated both orders.  *Id.* at *13.  Whether Wilson "knew that the

transaction was designed to achieve a wash result in a manner that negated risk," as *Piasio* paraphrased *Bear Stearns*, depended on whether Wilson knew that the orders he executed were being paired for one customer (and were therefore wash sales) or instead were between two different customers. *Id.* at *7, 13. Wilson made some inquiry about the trades, but not about his wash transaction concerns; moreover, the response did nothing to dispel his wash trading concerns. *Id.* at *13. Wilson then executed the orders anyway. *Piasio* held that whether Wilson "made a good faith effort to avoid participating in an improper transaction" determined whether he had acted with the required intent. Accordingly, *Piasio* reaffirmed the requirement that Wilson know "the wrongful nature of the challenged trade at the time of his participation." *Bear Stearns*, 1991 WL 83520, at *15.

Given the intent required to establish a wash sale violation, the CFTC must prove RBC did not believe that its block trades with separate affiliate entities were bona fide transactions. Nothing could be more probative of RBC's good faith belief than the fact that the CME and OneChicago informed RBC that its block trading with its subsidiaries was permissible and later informed RBC that the CFTC had also found no violation.

**VI.  Under *Stoller*, RBC's Lack of Notice Regarding the CFTC's Newly Articulated Prohibition on Affiliate Block Trades is a Valid Affirmative Defense.**

**A.  *Stoller* Provides a Valid Affirmative Defense.**

In *Stoller*, the Second Circuit delivered a stern rebuke to the CFTC's efforts to enforce an unannounced interpretation of the wash sale prohibition without providing sufficient notice of that new interpretation. Recognizing that Section 4c of the Commodity Exchange Act (the "Act") is imprecise (at best) and the meaning of a prohibited "wash sale" undefined, the Second Circuit held that lack of notice is an "incurable defect" to a CFTC enforcement action, given the intent required. *Stoller*, 834 F.2d at 265.

Specifically, the CFTC was attempting in *Stoller* to enforce an otherwise unannounced position that an industry practice known as a "roll-forward" trade was a wash sale. *Id.* at 265-66. Because the "essential and identifying characteristic of a wash sale seems to be the intent not to make a genuine, *bona fide* trading transaction" the CFTC conceded that it needed to "demonstrate that respondent knowingly participated in transactions initiated with the intent to avoid a bona fide market position." *Id.* at 265 (citation omitted). The Second Circuit held that the CFTC could not announce via an enforcement complaint a new standard for a "bona fide" transaction (taken out of context from factually distinguishable cases) and then "charge a knowing violation of that revised standard." *Id.* at 265-66.

Just as in *Stoller*, the CFTC is once again trying to regulate by enforcement. Here, it is not clear what standard the CFTC is attempting to enforce with respect to whether affiliate block trades are bona fide transactions between separate entities or are not bona fide because they should instead be considered transactions of a single entity trading with itself. There is no pre-existing standard, and the Amended Complaint itself is not clear because it merely alleges in a conclusory fashion that RBC traded with itself. RBC is left to wonder whether the CFTC is applying traditional veil-piercing principles, the arm's length standard from its 2004 proposed guidance, the rules from its 2008 proposed guidance, or some other standard. The CFTC has steadfastly refused to pin itself down and will only state that its prior proposed guidance is irrelevant.[5] As a result, the legal standard the CFTC is attempting to enforce is unannounced,

---

[5] The CFTC has even gone so far as to resist RBC's efforts through Rule 30(b)(6) depositions to determine with certainty the agency's official position as to what it believed the legal standard applicable to affiliate block trading to be from 2006 through 2010, when the affiliate trading block trading at issue in the Amended Complaint occurred. (CFTC's Initial Designations and Objections to Defendant's Notice of 30(b)(6) Deposition, at 5-6).

novel, and inconsistent.  *Stoller,* thus, provides RBC with an affirmative defense that it did not receive fair notice of a new standard.

     **B.**    ***Stoller* Is Not Distinguishable.**

     The CFTC argues that *Stoller* is distinguishable because RBC had fair notice that wash sales were prohibited by Section 4c.  But so did Stoller.  The issue in *Stoller* was lack of notice that *roll-forward trades* were not considered bona fide.  And the issue here is lack of notice that *affiliate block trades* are not considered bona fide.  The CFTC's assertion here that it is relying only on the traditional definition of a wash sale in prosecuting this action misses the point.  Much like it did in *Stoller*, the CFTC is now impermissibly *applying* that traditional definition to affiliate block trading in a novel way, by taking legal standards out of context from factually distinguishable cases.  *Stoller*, 834 F.2d at 266.

     Further, this case is not like the *DiPlacido* decision that rejected a *Stoller* defense because the CFTC's interpretation of the Act in that case was consistent with the CFTC's past readings of the Act and past practice.  *DiPlacido v. CFTC*, 364 F. App'x 657, 660 (2d Cir. 2009).  The CFTC's interpretation of the Act in this case, specifically its view of what constitutes a wash sale or fictitious transaction, is *not* consistent with the agency's prior readings and practice.[6]

     Simply put, the Act does not prohibit affiliate block trades, and the CFTC has never informed market participants that it believes affiliate block trades are improper.  To the contrary, in 2004 it rejected a "presumption of illegitimacy" for these transactions and has approved exchange rules for their execution.  The CFTC argues RBC had constructive notice of its litigation position from previous wash sale decisions concerning transactions that were "virtually

---

[6] The CFTC reverses the relevant issue.  RBC does not contend that the CFTC's proposed guidance represented a change to the agency's interpretation of the Commodity Exchange Act; the CFTC's litigation position *in this case* represents a change from the CFTC's prior readings and practice on affiliate block trades, including impermissibly backtracking from its published guidance.

risk-free, often prearranged, and designed to mislead [market participants into believing that the trades had actually been submitted to the open market]."  (CFTC Br. at 11 (citing *Stoller*, 834 F.2d at 266)).  But it can certainly be "well believe[d]" that those decisions were factually distinguishable.  *Stoller*, 834 F.2d at 266.  In the first place, affiliate block trades would be "virtually risk-free" only if the CFTC was entitled to presume that RBC and its affiliates were a single entity, trading with itself.  Further, block trades are, by definition, permissibly prearranged.  And finally, what the CFTC identifies as the "common denominator" of wash trading – techniques that give the [false] appearance that prearranged trades were submitted to the open market – was not present here and is not relevant here.  Under OneChicago's block trading rules, RBC's trading was transparently reported as prearranged block trades at all times.

The CFTC's past practice is also inconsistent with the notion that affiliate block trades are unlawful.  In 2005, when RBC provided detailed information to the CFTC and OneChicago showing that its affiliates intended to trade futures on a non-competitive basis, discussing how those trades would be priced, and describing sample transactions, neither the CFTC nor OneChicago rejected the proposed strategy out of hand.  To the contrary, both regulators discussed the trades in the context of the proposed guidance.  Each allowed the trades to go forward.  *Stoller*, 834 F.2d at 265 (public had insufficient notice of the CFTC's alleged position in the absence of its enforcement).  Nothing about that past practice is consistent with the position the CFTC has taken in this case.

In addition, the Court should reject the CFTC's reliance on decisions from 1948 and 1988 for the contention that affiliate block trades were unambiguously determined to be wash sales.  (CFTC Br. at 12-13).  Those cases do not involve block trades, which were not even permitted until after enactment of the Commodity Futures Modernization Act of 2000.  So those cases, like

others decided before 2000, are of little, if any, relevance to the CFTC contention that "identical" trades have been previously evaluated.  *Id*. at 13.

Finally, the nature of the incurable defect in *Stoller* – lack of fair notice, precluding specific intent – differentiates its holding from the CFTC's strawman argument that waiver and estoppel somehow negate *Stoller*.  While the CFTC spends nearly seven pages discussing the doctrines of waiver and estoppel, *Stoller* does not invoke or depend on either one.  And while RBC has asserted waiver and estoppel as two of its affirmative defenses, its lack of fair notice is and should be the focus here.[7]  Clearly, the Second Circuit explicitly recognizes lack of fair notice as a defense to CFTC enforcement actions, including wash sale actions.  *Stoller* is consistent with the "fundamental principle in our legal system" of due process, which mandates that "laws which regulate persons or entities give fair notice of the conduct that is forbidden or required."  *FCC v. Fox Tele. Stations, Inc.,* 132 S. Ct. 2307, 2317 (2012).[8]

## VII.  The CFTC's 2004 and 2008 Proposed Guidance is Relevant Both to the CFTC's Burden of Proof Regarding Intent and to RBC's Affirmative *Stoller* Defense.

RBC recognizes, of course, that the CFTC has never finalized its guidance regarding requirements for affiliate block trading and that the proposed guidance never became effective. RBC has never argued that the CFTC's proposed guidance trumps Section 4c of the Act.  But the CFTC's assertion that its 2004 proposed guidance is "not relevant to the Court's analysis of the

---

[7] RBC notes, however, that the Supreme Court has refused to hold that estoppel may never run against the government.  *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60 (1984) and *OPM v. Richmond,* 496 U.S. 414, 423 (1990).  In addition, the SEC actions relied on by the CFTC are distinguishable because the CEA does not contain a provision, as does the Securities Exchange Act, to the effect that "[n]o action or failure to act by the [SEC] . . . shall be construed to mean that the particular authority has in any way passed upon the merits of, or given approval to, any security or any transaction[s] . . . ."  15 U.S.C. § 78z.

[8] *Stoller* is not an outlier.  In addition to *Stoller*, other Second Circuit cases that have applied the fair notice defense to bar enforcement of government actions include *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (overturning sanction imposed "pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public") and *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 184 (2d Cir. 1976) (revising and limiting SEC sanctions where violations occurred during "years of considerable uncertainty as to the regulatory climate concerning [the violation]").

CFTC's [wash sale] claims under Section 4c(a) of the [Commodity Exchange] Act" is baseless. (CFTC Br. at 7).  In fact, the proposed guidance is probative of both RBC's good faith intent and its lack of *scienter*, as evidenced by its compliance with the proposed guidance.

As a threshold matter, the CFTC staff itself fully understood the relevance of the proposed guidance when it examined RBC's trading activity.  It demanded that RBC explain how the affiliate block trading complied with the proposed guidance.  In September 2005, the CFTC staff instructed the CME to pose a number of questions to RBC to determine whether the affiliate block trading constituted wash sales, including the following:

> In a Federal Register release dated July 1, 2004 (Vol. 69, No. 126), the CFTC published proposed guidance on Core Principle 9 which discusses Block Trades between affiliated parties and criteria necessary for the transactions to be assumed to be at "arms length" (copy attached).  Please discuss RBC's procedures for conducting the block trades, and indicate if RBC and its affiliates believe they meet the "arms-length" criteria discussed in the release.

(9/20/2005 e-mail, CME-ONE 000000155-63).

The CME even sent RBC a copy of the proposed guidance to ensure RBC grounded its analysis in the language and concepts of that release.  Eric Wolff, the senior CME regulatory official, testified at his deposition that the CME was "being pressured" by the CFTC staff "to delve into whether RBC had considered the draft guidance and further whether they felt they met the draft guidance," which the CFTC believed to be "a key issue."  (4/21/2014 Wolff Tr. at 109:11-20).[9]  Even CFTC witnesses have confirmed that the proposed guidance was relevant, in general, to the agency's evaluation of block trading activity.  (Shilts Tr. at 113:15-25 ("Did you view the proposed rule as having relevance to the inquiry about whether trading activity violated

---

[9] Mr. Wolff also testified that the proposed guidance was more restrictive than existing law.  (*Id.* at 78-79).  It necessarily follows that if RBC's affiliate block trading complied with the more restrictive proposed guidance, it also complied with the wash sale prohibition in Section 4c(a) of the Commodity Exchange Act.

applicable law?   MR. SLOVICK: In general, not RBC specific I believe is the question.   A: Yes.")).

Moreover, the proposed guidance itself purported merely to clarify and provide more detailed guidance on *existing law,* and did *not* purport to create any new, theretofore unannounced standards.  *See* 69 Fed. Reg. at 39884 ("*these amendments incorporate standards that the Commission has previously determined* protect market participants and the public, the financial integrity or price discovery function of the markets, and sound risk management practices.") (emphasis added).[10]

In short, the CFTC's proposed guidance reflected the agency's thinking at the time on whether and when block trading between affiliates – something that was and is lawful despite its inherently non-competitive nature – crossed the line from permissible to impermissible under existing law. The CFTC's 2004 proposed arm's length standard, and its 2008 proposed presumption that a block trade between affiliates would be an arm's length trade if based on a competitive market price by separate and independent trader decision-makers,[11] may not have

---

[10] Because the proposed guidance did not purport to alter existing law, the CFTC's reliance on *CFTC v. Schor*, 478 U.S. 833 (1986), is misplaced.  In *Schor*, the CFTC had proposed a *rule* change that would have created an *entirely new* procedure for the adjudication of counterclaims.  *Id.* at 846-47.  It hardly needs citation that a rule is not binding until it is legally effective.  Here, by contrast, the CFTC published proposed *guidance* concerning the conditions by which a market participant could be assured that his conduct would not violate *existing* law.

[11] Specifically, the CFTC's 2004 proposed guidance established a presumption that affiliate block trades were arm's length under either of two scenarios.  69 Fed. Reg. at 39883.  First, trading would be deemed arm's length if it occurred "between parties that have an arm's length organizational structure," defined as counterparties who "each have a separate account controller, with its own responsibility to review and evaluate the terms and conditions and the potential risks and benefits of prospective transactions."  *Id.* Alternatively, affiliate block trades would be considered arm's length when (i) executed during trading hours (ii) at a price between the bid/ask spread on the cash market.  *Id.*  In 2008, without explicitly referring to the concept of "arm's length," the CFTC proposed modified requirements for affiliate block trading: (i) the block trade price must be based on a competitive market price, either by falling within the contemporaneous bid/ask spread on the centralized market or calculated based on a contemporaneous market price in a related cash market; (ii) each party must have a separate and independent legal bona fide business purpose for engaging in the trades; and (iii) each party's decision to enter into the block trade

acquired the force of law; but they informed market participants, including RBC, about the CFTC's view of when two affiliates should be viewed as separate entities, rather than a single entity trading with itself.[12]   Whether RBC sought to comply with that guidance is directly relevant to whether RBC intended to effect a bona fide trade.   Likewise, the proposed guidance – and the CFTC's clear embrace of it in 2005 – is relevant to whether, under *Stoller*, fundamental fairness would prohibit the CFTC from enforcing an affiliate block trading standard wholly at odds with its prior position.   *Stoller,* 834 F.2d at 265-66.

## VIII.   The CFTC's Fictitious Trading Claim Depends Entirely on its Wash Sale Theory.

The CFTC cannot show that RBC's affiliate block trades are fictitious without also succeeding on its wash sale claim.   As discussed, Regulation 1.38(a) explicitly allows prearranged block trading pursuant to CFTC-approved exchange rules.   *See* 41 Fed. Reg. 3192 (Jan. 21, 1976).   RBC and its affiliates each followed every requirement of the OneChicago rule for block trades, but the CFTC relies on a general catch-all in that rule incorporating the Act's prohibition on wash sales.   (Am. Compl. at ¶ 18).   Absent the alleged wash sale violation, therefore, prearranged affiliate block trading is permitted by Regulation 1.38(a).   Even the broadest interpretation of "fictitious" could not apply the term to a transaction that is allowed by CFTC Regulation 1.38(a) and conducted pursuant to CFTC-approved exchange rules.

---

must be made by a separate and independent decision-maker. *Execution of Transactions: Regulation 1.38 and Guidance on Core Principle 9,* 73 Fed. Reg. 54097, 54101 (Sept. 18, 2008).

[12] Notably, the CFTC took the position in a brief filed just last week that even "final" guidance does not bind the agency.   Nonetheless, in that other case, the CFTC acknowledged (and did not deny, as it does here) the obvious legal reality, derived from scores of cases, that "[a]gencies frequently and permissibly issue policy statements regarding how they intend to enforce a statutory scheme" and that "a policy statement is supposed to apprise the public of the agency's intentions and assist 'long range planning within the regulated industry.'"   CFTC Summary Judgment Reply Brief, *SIFMA v. CFTC*, No. 13-cv-01916 (D.D.C.), Dkt. #40 at 16 & 18 (quoting *Center for Auto Safety, Inc. v. NHTSA*, 342 F. Supp. 2d 1, 20 (D.D.C. 2004)).   The inconsistency between the CFTC's litigation positions in two pending cases is explained by the results it seeks in each case, rather than some principled distinction.

IX.     **The Supreme Court's Decision in *Gabelli* Means that No Discovery Rule Tolled the Statute of Limitations on the CFTC's False Statement Claim.**

The CFTC's false statement claim in Count III is subject to a five-year statute of limitations that cannot be extended by a discovery rule.  *Gabelli,* 133 S.Ct. at 1220.  The most recent false statement alleged in the Amended Complaint was made in November 2005, six-and-a-half years before this action was commenced.  When this Court denied without prejudice RBC's motion to dismiss Count III as premature, a Second Circuit decision suggested that a discovery rule might extend the five-year statute of limitations.  *SEC v. Gabelli,* 653 F.3d 49, 59 (2d Cir. 2011); 28 U.S.C. § 2462.  In the interim, the Supreme Court has reversed and held that no discovery rule applies.[13]

X.      **Conclusion**

RBC has attempted to summarize the primary legal issues relevant to a wash sale analysis of affiliate block trading, not to address every disputed issue raised by the CFTC's educational brief or its pleadings.  RBC appreciates the Court's invitation to submit this educational brief and stands ready to submit whatever additional materials the Court may request.

---

[13] The CFTC brought Count III purely as a tactic to try, in vain, to explain why the agency sat on its hands for so long while it monitored RBC's affiliate block trading that, years later, it would challenge as violative of the law.  Even if the false statement claim were timely, the CFTC could never prove the elements of that claim because, among other reasons, none of the statements at issue were remotely false.

**Dated:** May 7, 2014

Respectfully submitted,

ROYAL BANK OF CANADA

By: /s/ Ted S. Helwig

Arthur W. Hahn, *pro hac vice*
(arthur.hahn@kattenlaw.com)
Ted S. Helwig, *pro hac vice*
(ted.helwig@kattenlaw.com)
Gil M. Soffer *pro hac vice*
(gil.soffer@kattenlaw.com),
Katten Muchin Rosenman LLP
525 West Monroe Street, Suite 1600
Chicago, IL 60661
Tel: (312) 902-5200
Fax: (212) 902-1061

William M. Regan (WR-7795)
(william.regan@kattenlaw.com)
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
Tel:  (212) 940-8800
Fax:  (212) 940-8776

*Attorneys for Royal Bank of Canada*

## CERTIFICATE OF SERVICE

I, Ted S. Helwig, hereby certify that on May 7, 2014, I caused a copy of the foregoing Educational Brief to be electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing documents are being served this day on all Counsel of Record via transmission of Notices of Electronic Filing generated by CM/ECF.

**Dated:**  May 7, 2014

Respectfully Submitted,

By: /s/ Ted. S. Helwig
Katten Muchin Rosenman LLP
525 W. Monroe St.
Chicago, IL  60661
312-902-5537
312-902.1061 (fax)
ted.helwig@kattenlaw.com