# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION,<br><br>                    Plaintiff,<br><br>   v.<br><br><br><br>ROYAL BANK OF CANADA,<br><br>                    Defendant. | Civil Action No. 12 Civ. 2497 (AKH/KNE)<br><br><br>**RBC'S RESPONSE IN OPPOSITION TO THE CFTC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br><br><br>ECF Case |

**<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION. ........................................................................................... 1

II.     LEGAL STANDARD APPLICABLE TO PARTIAL SUMMARY JUDGMENT. .......... 5

III.    THE BLOCK TRADES BETWEEN SEPARATE RBC ENTITIES WERE NOT
        WASH SALES OR FICTITIOUS TRANSACTIONS (COUNT I). ................................ 6

        A.      The CFTC has presented its case under the wrong legal framework. ................... 6

        B.      RBC believed it was bargaining faithfully and intended to make bona fide,
                genuine trading transactions. ................................................................. 11

        C.      Motive to achieve an after-tax profit does not establish intent to avoid a
                bona fide trading transaction ................................................................. 12

        D.      The block trades are not fictitious trades. .............................................. 14

IV.     DISPUTED ISSUES OF FACT REMAIN CONCERNING RBC'S *STOLLER*
        DEFENSE, PRECLUDING SUMMARY JUDGMENT ON COUNT I ........................ 15

        A.      *Stoller* provides an independent basis to deny the Motion, based on RBC's
                lack of notice that the CFTC no longer considers affiliate block trades to
                be bona fide transactions ..................................................................... 15

        B.      *Stoller* is not distinguishable and presents factual disputes regarding notice
                that cannot be resolved on summary judgment .................................... 17

V.      RBC MADE NO FALSE STATEMENTS OR OMISSIONS TO CME ABOUT
        BLOCK FUTURES TRADING BETWEEN RBC AFFILIATES (COUNT III). .......... 18

        A.      RBC's October 18, 2005 response to CME was not false or misleading. ............ 19

                1.      RBC did not have or conceal an intent to exclude competition from
                        non-RBC firms ....................................................................... 19

                2.      RBC did not misrepresent how it believed its affiliate block trading
                        complied with the CFTC's arm's length criteria. ...................... 22

        B.      RBC's November 17, 2005 response to the CME's follow-up questions
                was not false or misleading .................................................................. 23

                1.      RBC did not make false statements to CME about how the idea of
                        SSF trading originated. ............................................................ 23

                2.      RBC did not make false statements to CME regarding the future
                        possibility of trading with non-RBC affiliated counterparties ................. 25

C.      Any alleged errors in RBC's statements to CME were immaterial and could not have thwarted CME's inquiry into RBC's affiliate block trading. ....... 29

D.      None of the alleged errors in RBC's statements to CME, even if proven, show RBC engaged in willful misrepresentation.................................................... 30

VI.     THE CFTC'S FALSE STATEMENT CLAIM IS TIME-BARRED. ............................. 31

VII.    CONCLUSION .................................................................................................................. 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthur Lipper Corp. v. SEC*,
    547 F.2d 171 (2d Cir. 1976)................................................................16

*CFTC v. Amaranth Advisors, L.L.C.*,
    554 F. Supp. 2d 523 (S.D.N.Y. 2008)....................................................29

*CFTC v. ISB Clearing Corp.*,
    No. 03-CV-9127 (GBD), 2006 WL 5266749 (S.D.N.Y. Nov. 7, 2006)................................29

*CFTC v. Moncada*,
    No. 12 Civ. 8991 (S.D.N.Y. Jan. 29, 2014)...........................................11

*CFTC v. Savage*,
    611 F.2d 270 (9th Cir.1979) ........................................................11, 15

*CFTC v. Schor*,
    478 U.S. 833 (1986)..........................................................................9

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)..............................................................29

*FCC v. Fox Tele. Stations, Inc.*,
    132 S. Ct. 2307 (2012)....................................................................16

*Gabelli v. SEC*,
    133 S. Ct. 1216 (2013)....................................................................31

*Gallo v. Prudential Residential Services, Ltd. Partnership*,
    22 F.3d 1219 (2d Cir. 1994)................................................................5

*Graham v. Long Island R.R.*,
    230 F.3d 34 (2d Cir. 2000)..................................................................5

*In re Buckwalter*,
    [1990-1992 Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶24,995 (CFTC Jan. 25, 1991) ...........................................................................14

*In re Dana Corp.*,
    574 F.3d 129 (2d Cir. 2009)................................................................6

*In re Jean Goldwurm*,
    7 Agric. Dec. 265 (1948) .................................................................14

*Kearney v. Prudential-Bache Securities Inc.*,
  701 F. Supp. 416 (S.D.N.Y. 1988)...................................................................31

*Marvel Characters, Inc. v. Simon*,
  310 F.3d 280 (2d Cir. 2002).........................................................................5

*Matter of EMF Fin. Prod.*,
  Comm. Fut. L. Rep. (CCH) ¶31,441 (CFTC Nov. 13, 2009) ..................................29

*Matter of McMahan*,
  Comm. Fut. L. Rep. (CCH) ¶ 31,662, 2010 WL 4491884 (CFTC Nov. 5,
  2010) .................................................................................................30

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*,
  182 F.3d 157 (2d Cir. 1999).........................................................................5

*Patrick v. LeFevre*,
  745 F.2d 153 (2d Cir. 1984).................................................................6, 18, 31

*Reddy v. CFTC*,
  191 F.3d 109 (2d Cir. 1999).....................................................................11, 15

*Rosenfeld v. C.I.R.*,
  706 F.2d 1277 (2d Cir. 1983)......................................................................13

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)........................................................................28

*Stoller v. CFTC*,
  834 F.2d 262 (2d Cir. 1987)............................................................... *passim*

*United States v. Kwiat*,
  817 F.2d 440 (1987).................................................................................30

*Upton v. SEC*,
  75 F.3d 92 (2d Cir. 1996) ..........................................................................16

*Wechsler v. Steinberg*,
  733 F.2d 1054 (2d Cir. 1984).......................................................................5

**Statutes**

Commodity Exchange Act...........................................................5, 6, 17, 31

Commodity Exchange Act § 4c .............................................1, 11, 15, 17

Commodity Exchange Act § 9(a)(4).........................................29, 30, 31

Commodity Futures Modernization Act of 2000.........................................6

**Rules**

Fed. R. Civ. P. 56(c) ...........................................................................................5

**Other Authorities**

69 Fed. Reg. 39,880, 39,883 (July 1, 2004)........................................................9

73 Fed. Reg. 54,097, 54,101 (Sept. 18, 2008) ...................................................9

75 Fed. Reg. 67,657, 67,660 (Nov. 3, 2010)......................................................28

*Clearing Exemption for Swaps Between Certain Affiliated Entities*, 78 Fed. Reg.
    21,750, 21,752 (2013) (to be codified at 17 C.F.R. pt. 50).........................8, 9

*Large Order Execution in the Futures Markets, Committee on Futures Regulation
    of the Association of the Bar of the City of New York*, 44 Bus. Law. 1335
    (1988-89)..................................................................................................6

## I.    INTRODUCTION.[1]

The CFTC's motion for summary judgment fails for many reasons.  Permeating the CFTC's entire legal theory is a basic, fundamental defect: the CFTC refuses to recognize the crucial distinction between open-market trading and the block trading that occurred in this case.  The Motion is based on law that simply does not apply here.  The Motion should be denied.

The CFTC has asserted its wash sale arguments under an inexplicably incorrect legal theory.  Block trades are, by their very construct, exceptions to the prearrangement and non-competitive trading prohibitions in Section 4c of the Commodity Exchange Act ("CEA").  At its most basic level, block trading – whether between affiliates or unrelated parties – is prearranged and noncompetitive.

Without support or logic, the CFTC attempts here to engraft the legal framework for wash sales in open-market trading onto prearranged block trades.  But the CFTC never mentions that the cases it cites concern entirely open-market trades.  Nor does the CFTC cite a single case – because there are none – supporting the proposition that general wash sale rules apply to block trading.  Worse, the CFTC barely acknowledges the nature of the block trades at issue here, and it entirely ignores the crucial distinctions between block and open-market trades.  The CFTC's entire legal theory is disingenuous.

The CFTC further emphasizes that in its view "[t]he common denominator of [a wash sale] … is the use of trading techniques that give the appearance of **submitting trades to the**

---

[1] Royal Bank of Canada ("RBC") submits this Opposition to the Motion for [Partial] Summary Judgment [on Counts I and III] ("Motion") and Memorandum in Support ("CFTC Br.") submitted by the Commodity Futures Trading Commission ("CFTC"), regarding the Single Stock Futures ("SSF") and Narrow Based Index Futures ("NBI") trading between RBC affiliates on the OneChicago Exchange ("OneChicago"), and the related statements made by RBC to the Chicago Mercantile Exchange ("CME"). RBC also relies on, and cites to, RBC's Response to the CFTC's Statement of [Purportedly] Undisputed Facts ("RBC-SOF ¶ R_ ") and RBC's Statement of Additional Material Facts Presenting a Genuine Issue for Trial ("RBC-SOF ¶ A_").

**open market** while negating the risk or price competition **incident to such a market.**" (CFTC Br. at 28) (emphasis added).  The critical flaw in this reasoning is that block trades and open-market trades inherently *do not* have common "denominators," and the CFTC never recognizes the different law applicable to evaluating wash sales when the transactions are block trades.  The CFTC also repeatedly invokes Core Principle 9 for the proposition that trades must be "open" and "competitive." (CFTC Br. at 24.)   Yet the same Core Principle 9 specifically allows exchanges to adopt exceptions to open-and-competitive trade requirements – including rules like OneChicago Rule 417 permitting block trades.

In short, the CFTC's repeated assertions – made under the wrong legal framework – that the affiliate block trades here were private and non-competitive (and were intended as such) are mere truisms.  They are not dispositive of anything and, moreover, the Motion's application of the wrong law would make all affiliate block trades unlawful wash sales.  That result would be contrary to exchange rules the CFTC has allowed to go into effect and contrary to interpretations by exchanges about which the CFTC has never objected.

The CFTC also asserts that RBC's block trades established a "perfect wash result" because they involved (i) the purchase and sale (ii) in the same delivery month of the same futures contract and (iii) at the same or similar price.  (CFTC Br. 29-30.)   By the CFTC's logic, *all* affiliate block trades yield "perfect wash results" and therefore are unlawful wash sales.  That is not the law.  Affiliate block trading is lawful, and an affiliate block trade is not rendered unlawful solely because the counterparties to the trade acquire equal and opposite open futures positions.

The CFTC's fundamental errors should suffice to deny the Motion.  However, insofar as the CFTC seeks to use this enforcement action to transform heretofore permissible block trading

between affiliates into unlawful wash sales, its Motion must fail on at least two additional grounds. First, even if there were a basis to find a wash result or fictitious sale under the appropriate legal analysis (there is not), the CFTC also must prove that each counterparty *intended* not to make a bona fide trade. That it cannot do. RBC affiliates block traded consistent with applicable exchange rules, and with the full knowledge and oversight of the CME and the CFTC. RBC submitted its trading strategies to the CME for review and approval, and those strategies were subject to a lengthy and thorough inquiry by both the CME and the CFTC. The CME informed RBC that block trading among its affiliates was permissible, and that the CFTC had likewise found no violations. After the CFTC authorized the CME to communicate that message to RBC, the CFTC sat by without comment as it watched RBC affiliates trade day in and day out, for five years, on the OneChicago exchange. None of this supports a finding of intent by RBC to trade in a prohibited manner; in fact the opposite is true. And at the very least, RBC's intent is a question for the trier of fact.

Second, the CFTC may not simply declare, through this case, that prearranged, non-competitive affiliate block trades are unlawful and hold RBC retroactively liable for them. Doing so would contradict exchange rules and interpretations along with CFTC guidance and would violate the Second Circuit's prohibition against enforcing a new rule or policy without fair notice. *Stoller v. CFTC*, 834 F.2d 262, 267 (2d Cir. 1987). Indeed this case is even stronger than *Stoller* – the CFTC in this case ignores the applicable legal standards, whereas *Stoller* involved the CFTC attempting to establish a legal standard where none had existed before. Lack of such notice constitutes an affirmative defense under *Stoller,* and it is another reason why the Motion must be denied.

Finally, the CFTC's false statement claim must fail both legally and factually.  The Motion asserts that the statements are relevant under the wrong legal standard.  The CME could not have been misled by statements that have no application when applying the correct legal standard and factual context.  In addition, the CFTC repeatedly distorts the record concerning its false statement claim.  It quotes selectively from documents and testimony.  It reverses the timeline of events, suggesting, for example, that RBC's responses to questions as of October 2005 "omitted" facts responsive only, if at all, to CME's subsequent set of follow up questions answered in November 2005.  It isolates inapposite statements made *late* in CME's inquiry to claim that RBC misrepresented from the *beginning* that its affiliate block trading was actually open and competitive trading.  And it fails to distinguish between facts relevant to trading in NBIs from facts relevant to trading in SSFs, which involve different RBC affiliates, different account controllers, different trade strategies, and different business issues.  RBC's alleged "omissions" could not have thwarted the CME's inquiry; they are, therefore, immaterial.

Beyond all of these fatal deficiencies, the Motion is doomed for yet another reason.  The evidence demonstrates that RBC did not engage in wash sales or make false statements; accordingly, nearly every material fact in the CFTC's version of facts is refuted by the record or otherwise disputed.  For example, the parties dispute the facts with respect to whether RBC "traded with itself" or whether the separate affiliate entities were independently controlled and made independent trading decisions.  Further, the scienter element of a wash sale claim would be particularly unsuited for summary judgment in any case, but here that issue is hotly contested because the evidence demonstrates that RBC sought and obtained permission to enter into the block trades before beginning that trading.  Moreover, RBC certainly disputes the accusations that it made false statements, or intended to do so, and the record permits a rational factfinder to

credit RBC's view.  RBC has submitted an affidavit to rebut the accusations – an affidavit that is necessary because the CFTC staff attorney never bothered to ask the pertinent questions when the relevant witness was deposed twice.  Indeed, the CFTC even concedes that its Motion is based entirely on evidence gathered before filing the Complaint and, thus, ignores all the facts and evidence developed in discovery.  In any event, the record evidence includes many disputes of material fact that should be adjudicated by a trier of fact, each of which preclude summary judgment.

As explained in RBC's Educational Brief [Docket #92], which the Motion simply ignores, the CEA permits noncompetitive, affiliate block trades made at arm's length.  The evidence shows that those are precisely the trades in which RBC and its affiliates engaged.  In stark contrast, the CFTC's entire theory of the case requires applying legal rules that are inherently inapplicable here.  Summary judgment should be denied.

## II.     LEGAL STANDARD APPLICABLE TO PARTIAL SUMMARY JUDGMENT.

The Second Circuit has "long recognized that summary judgment is a drastic device." *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999) (citation omitted).  It should be granted "sparingly" because it "cuts off a party's right to present [its] case to the jury."  *Id.*  Claims dependent on disputed allegations of willful intent, like Counts I and III here, are particularly inappropriate for pretrial resolution.  *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000); *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir. 1984).

The CFTC has the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 285-86 (2d Cir. 2002).  In response, RBC bears only a limited burden of production, and "all ambiguities must be resolved and all inferences drawn in favor of" RBC.  *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1223

(2d Cir. 1994).  "Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented."  *Patrick v. LeFevre*, 745 F.2d 153, 160 (2d Cir. 1984).

Lastly, where, as here, the Court must review the entire record, make credibility determinations, weigh the evidence, and draw inferences from the facts, summary judgment is inappropriate.  *In re Dana Corp.*, 574 F.3d 129, 151-52 (2d Cir. 2009).  This is not the rare case where the movant has met its high burden of showing the lack of any genuine issue of fact and the non-movant has failed to come forward with any contrary evidence at all.  At a minimum, the record is replete with genuine disputes about material facts.

## III.   THE BLOCK TRADES BETWEEN SEPARATE RBC ENTITIES WERE NOT WASH SALES OR FICTITIOUS TRANSACTIONS (COUNT I).

### A.     The CFTC has presented its case under the wrong legal framework.

At all times relevant to this case, the law has permitted corporate affiliates to enter into block futures trades with each other, even though block trades by definition are not executed in the open market and instead are privately negotiated and then disclosed to the market as such.[2] The CFTC has repeatedly suggested that RBC engaged in wash sales if it intended to eliminate price competition or market risk.  The CFTC grossly errs, however, by grafting requirements of

---

[2] Block trading in the futures markets developed from experience in the securities markets with large, potentially disruptive orders. Some market participants' orders are simply too large for the exchanges to absorb. Absent another mode of execution, large orders may reduce price stability on an exchange. Block trading permits sufficiently large trades to occur away from the open-outcry pit or central limit order book environment. *See generally Large Order Execution in the Futures Markets, Committee on Futures Regulation of the Association of the Bar of the City of New York*, 44 Bus. Law. 1335 (1988-89) (reviewing large order and block trades and contrasting them with other open-market trades, and noting that the CEA (in its then-present version) authorized the CFTC to permit prearranged block trades). Following enactment of the Commodity Futures Modernization Act of 2000, and pursuant to CFTC regulations for non-competitive transactions, OneChicago adopted block trade rules that were submitted to, and approved by, the CFTC.  (RBC-SOF ¶ A10.)   Other futures exchanges have also adopted block trade rules. *See, e.g.,* NYMEX and COMEX Rule 526; ICE Futures US Rule 4.07.

*open-market, competitive trading* onto privately negotiated, prearranged, non-competitive block trades.  First, all block trades – whether between affiliates or wholly unrelated parties – by definition avoid price competition.  Indeed, the CFTC's own witnesses agree.  (RBC-SOF ¶ A4; RBC-SOF ¶ R39.) ("Q. Is block trading inherently noncompetitive? A. Yes.") Intent to avoid price competition cannot be the relevant intent in this context.  If it were, then *all* affiliate block trades (indeed, all block trades of any sort) would be *per se* unlawful.  Not even the CFTC's staff believe that to be the CFTC's actual position (RBC-SOF ¶ A4.)   It makes no sense at all to insist that inherently private, non-competitive trades exhibit all the same features of competitive, public activity.  (*But cf.* CFTC Br. at 32) (citing open-market trading cases, and arguing that the private block trading at issue here is "marked by characteristics unlikely to occur in an *open and competitive market*") (emphasis added).

Second, all affiliate block trades would negate market risk and create a financial nullity if affiliated counterparties were simply *assumed* to be a single entity.  Rather than cite specific facts supported by evidence, the CFTC, without analysis or support, simply assumes that RBC and its affiliates are in reality one entity, trading *with itself*.  It then invokes wash sale criteria and cites wholly inapplicable precedents that apply (and only make sense) where a single entity trades *with itself* in an open market.  In that context, a wash result arises from the purchase and a sale of a futures contract at the same price by *one* entity.

But RBC and its affiliates are not one entity.  They are separate legal-entity affiliates.[3] And at the time the trading occurred, as now, block trades between affiliates were not prohibited

---

[3] The CFTC simply ignores, despite its own statements in the Federal Register to the contrary, that "[e]ntities that are affiliated with each other are separate legal entities notwithstanding their affiliation." *Clearing Exemption for Swaps Between Certain Affiliated Entities*, 78 Fed. Reg. 21,750, 21,752 (2013) (to be codified at 17 C.F.R. Part 50). In addition to this separateness, the

by any statute, regulation, rule, or administrative determination.  Rule 417 at the OneChicago exchange expressly permitted block trades at the time RBC's trading commenced, and the Rule did not prohibit affiliate block trading.  Accordingly, the CFTC never attempts to address the appropriate questions: When does block trading between affiliated entities produce a wash result? And when must the distinction between affiliated entities be disregarded, and the two entities be treated as one for purposes of wash sale analysis? The CFTC's Motion cites not a single case or interpretation applying open-market wash sale standards to affiliate (or any kind of) block trading.  The CFTC's Motion does not even recognize that wash sales must be evaluated differently when there is a non-competitive affiliate block trade.  Accordingly, the Motion is wholly without legal foundation.

The CFTC's own proposed guidance in 2004 and 2008, which the CFTC Motion does not even acknowledge, reflected the agency's thinking on these questions.  The proposed guidance indicated that exchange rules requiring a degree of "separateness" between affiliated counterparties would be acceptable.  The 2004 proposed guidance explained that affiliate block trades would be deemed acceptable if executed at arm's length – meaning that the "counterparties . . . each have a separate account controller, with its own responsibility to review and evaluate the terms and conditions and the potential risks and benefits of prospective transactions."  69 Fed. Reg. 39,880, 39,883 (July 1, 2004).[4]

The 2008 proposed guidance set out a three-part test for determining when an affiliate block trade would be permissible:

---

CFTC further ignores that "the [CFTC] believes that affiliates within a corporate group may make independent determinations …" *Id*. at 21,768.

[4] In the alternative, the 2004 proposed guidance stated an affiliate block trade would be presumed to be an arm's length transaction if the block trade was carried out at an arm's length price compliant with defined arm's length pricing parameters (with which RBC also complied). *Id*.

(i) The block trade price must be based on a competitive market price, either by falling within the contemporaneous bid/ask spread on the centralized market or calculated based on a contemporaneous market price in a related cash market;

(ii) Each party must have a separate and independent legal bona fide business purpose for engaging in the trades; and

(iii) Each party's decision to enter into the block trade must be made by a separate and independent decision-maker.

*See* 73 Fed. Reg. 54,097, 54,101 (Sept. 18, 2008).

The CFTC's 2004 proposed arm's length standard, and its 2008 proposed presumption that a block trade between affiliates would be an arm's length trade if based on a competitive market price and executed between separate and independent trader decision-makers, may not have acquired the force of law; but they informed market participants, including RBC, about the CFTC's view of when two affiliates should be viewed as separate entities, rather than a single entity trading with itself.  Incredibly, aside from quoting RBC's 2005 response to the CME's inquiry, the Motion mentions the 2004 and 2008 proposed guidance not a single time.  This despite considerable record evidence that the CFTC *itself* believed the proposed guidance relevant when it directed the CME to inquire into the legality of RBC's SSF/NBI trading in 2005.  (*See* RBC Educational Br. 13-14.) [5]

The CME and CFTC certainly viewed the proposed guidance as relevant at the time: As directed by the CFTC, the CME's inquiry unsurprisingly focused on the guidance.  (RBC-SOF

---

[5] The CFTC's educational brief to the court argued that the proposed guidance is irrelevant to the wash sale inquiry. It is telling that the CFTC does not even mention this point in the Motion. The Supreme Court decision on which the educational brief relied, *CFTC* v. *Schor*, 478 U.S. 833 (1986) is easily distinguishable, as RBC's educational brief noted: the proposed regulation in *Schor* would have effected a *change* in applicable law; here, by contrast, the 2004 and 2008 proposed guidance did not purport to change preexisting law. Indeed, other exchanges have established nearly identical rules as the CFTC proposed guidance. For instance, two months ago ICE Futures US, Inc. re-published Block Trade FAQs (originally issued in 2012) setting out the same substantive three-part test as the 2008 proposed guidance. (Ex. EEE to RBC-SOF; RBC-SOF ¶ A11.)  The CFTC's proposed guidance is clearly not irrelevant to the analysis.

¶¶ A6, A7.)   Drawing directly upon the factors set forth in the proposed guidance, the CME concerned itself principally with whether "there were two separate parties to the transaction, that there was no common control, [and] that … both strategies stood on their own and made economic sense…"  (RBC-SOF ¶ A12.)   And according to the CME, it was "[f]airly quickly … satisfied that they [the RBC affiliates] were not the same legal entity and that they were – that their – they were acting independently in the transaction, so we no longer had concerns about the wash trade issue."  (*Id*.)

Ultimately, the CFTC's wash sale allegations rest on two erroneous propositions: (i) that an altogether inapplicable legal regime applies here; and (ii) even applying the correct analytical framework, the CME was dead wrong in its review that RBC and the two separate legal entities with which it block-traded futures were "in reality a single entity trading with itself." (Am. Compl. ¶ 73.)   Yet the testimony confirms that (i) no one at CME, OneChicago, or RBC held this view, and (ii) it is inconsistent with facts showing separate legal structures, separate business purposes, separate account controllers, and arm's length trading.  (RBC-SOF ¶¶ A12, A13, A26-27; RBC-SOF ¶¶ R30, R76.) The CFTC's contrary allegation – which is disputed and must be proven – is the CFTC's *only* basis for concluding that the threshold element of a wash sale violation (a wash result) has occurred.[6] If the jury finds that RBC is distinct from and not "in reality a single entity" with those subsidiaries, there can be no wash sale violation.  Because the CFTC does not support that proposition in its Motion, there is, at the very least, a genuine issue of fact for trial.

---

[6] Even were the CFTC to prove a wash result, the separate traders also must have an improper intent, as explained below.

**B.    RBC believed it was bargaining faithfully and intended to make bona fide, genuine trading transactions.**

Compounding the CFTC's application of an erroneous legal standard, the CFTC also does not (and cannot) show as a matter of law that RBC and its affiliates *intended* to trade in a prohibited, unitary manner "to achieve a wash result in a manner that negated risk." (CFTC Br. at 29.)    The CFTC must prove that each RBC counterparty did not intend, in fact, to bargain faithfully and execute a bona fide, bilateral trade.  *See Reddy v. CFTC*, 191 F.3d 109, 119 (2d Cir. 1999), *citing CFTC v. Savage*, 611 F.2d 270, 284 (9th Cir.1979).  As the *Reddy* court noted, a transaction is not unlawful under Section 4c if "one in fact believes he is bargaining faithfully and intends to effect a bona fide trade." *Reddy*, 191 F.3d at 119 (quoting *Savage*, 611 F.2d at 284).

The "essential and identifying characteristic of a wash sale seems to be the intent not to make a genuine, bona fide trading transaction." *Stoller,* 834 F.2d at 265 (quotations and citations omitted).   Recent briefing filed by the CFTC in other cases confirms this necessary scienter standard.  *See* CFTC Memorandum of Law at 42-43, Docket No. 53 in *CFTC v. Moncada*, No. 12 Civ. 8991 (S.D.N.Y. Jan. 29, 2014).  The standard cannot by met by the CFTC in this case.

*Stoller* is particularly apt.  There, as here, no precedent existed for the CFTC's position that the trading activity in question ("roll-forward" trading in *Stoller*) constituted illegal wash sales.  Instead the CFTC attempted to rely on wash sale decisions arising in completely different contexts.  *Id.* at 264-66.  Stoller did not dispute that he had knowingly engaged in "roll-forward" trading, but he argued that he lacked notice (and therefore knowledge) that the CFTC considered it improper.  *Id.* at 266.  Without notice that roll-forward trading was improper, Stoller could not have believed that he was bargaining unfaithfully for a wash transaction, rather than a bona fide trade – and the CFTC could not carry its burden of proving Stoller's intent.

Even more than the defendant in *Stoller*, RBC reasonably believed that it was engaging in a proper trading strategy. *A fortiori*, RBC did not trade with the requisite intent to create a wash sale. On their face, RBC's affiliate block trades were permissible. OneChicago rules permitted non-competitive, prearranged block trading. RBC presented its trading strategies to its regulator, CME, for review and approval. The CME and CFTC conducted a lengthy inquiry, in the course of which the CME informed RBC not only that its trading strategies were permissible, but that the CFTC had likewise found no violations. (RBC-SOF ¶¶ A1, A2, A8.) And perhaps most notably, the CFTC, CME, and OneChicago – fully armed with the details of RBC's trading and having communicated to RBC that the trading could proceed – permitted it to continue day after day, month after month, for five years. (RBC-SOF ¶ A9.) Nothing could be more probative of RBC's good faith belief in the bona fides of its trading activity.

**C.**   **Motive to achieve an after-tax profit does not establish intent to avoid a bona fide trading transaction.**

The Motion states that "wash sales are not made lawful when motivated by otherwise legitimate economic purposes." (CFTC Br. at 32.) The reverse is equally true: Legitimate economic motivations do not make otherwise lawful transactions wash sales. To the extent the CFTC means to suggest that RBC engaged in some sort of improper tax scheme, there is not a shred of evidence to support such a claim, and the CFTC points to none. (CFTC Br. at 33 n.8.) Moreover, the SSF and NBI trades themselves caused no tax consequence at all. RBC's overall trading strategies were completely lawful and ordinary, including their tax consequences. The trading in this case did not result in RBC improperly "avoiding" a single penny of taxes.

As an initial matter, the tax consequences of the strategies involving affiliate block trades were fully disclosed to CME and cannot be, as the CFTC suggests, an "ulterior motive." By way of example, CME understood that it was "mutually beneficial" for two separate RBC entities to

engage in the SSF transactions because they achieved "lower capital costs" for one entity and hedged cash positions that had a "tax posture" for the other.  (RBC-SOF ¶ A15.) The CFTC's own documents show that CME understood RBC Bahamas branch "has a certain tax posture … by which it directly benefits from the dividend flow of actual common stock." (RBC-SOF ¶ A15.)  In RBC's October 18, 2005 letter, RBC explained the different equity businesses of RBC Bahamas branch and CMA, noting as a "Purpose of the SSF Strategies" that "CMA does not earn a tax credit … for U.S. taxes withheld on dividends received by it on U.S. securities" but "when RBC (Bahamas branch) itself holds a cash position against the SSFs … [i]t is able to reduce its non-U.S. taxes…" (RBC-SOF ¶ A16.) CME further understood that the mutually beneficial transactions would have the overall effect of "allocating securities positions across subsidiaries." (RBC-SOF ¶ A17.)

As RBC has repeatedly explained to the CFTC, the relevant Canadian tax laws merely prevent double taxation on certain dividend income.  (RBC-SOF ¶ R30; RBC-SOF ¶ A14.) Every similarly situated Canadian corporation that receives dividend income from Canadian companies or that pays U.S. withholding tax for dividends received from U.S. companies is entitled to the same treatment as RBC under Canadian tax law.  The testimony in this case confirms that what the CFTC labels a tax motive is really a legitimate business motive, informed by many considerations, including as one component the Canadian tax law treatment for certain dividend income and payment of foreign taxes.  (RBC-SOF ¶ A18; RBC-SOF ¶¶ R30-R37.) Every business conducts its affairs with this kind of motive, and it is not improper.  *See, e.g., Rosenfeld v. C.I.R.*, 706 F.2d 1277, 1281 (2d Cir. 1983) ("a transaction which is otherwise legitimate, is not unlawful merely because an individual seeks to minimize the tax consequences of his activities.").

The CFTC's wash sale cases that involved a tax motivation are distinguishable from the SSF and NBI trading here because those cases involved improper, non-competitively executed trades on an open market, as opposed to permitted block transactions, and the futures transactions directly created the tax result.  *See, e.g., In re Jean Goldwurm,* 7 Agric. Dec. 265 (1948) (simultaneous purchase and sale for tax purposes); *In re Buckwalter,* [1990-1992 Transfer Binder], Comm. Fut. L. Rep. (CCH) ¶24,995 (CFTC Jan. 25, 1991) (spread transactions allowed losses in one year to be essentially equal to gains in following year).  Those are not the facts here.

**D.      The block trades are not fictitious trades.**

The CFTC's fictitious trade allegation suffers from the same fundamental flaw as its wash sale allegation: As the CFTC uses it, the concept simply has no application to the privately negotiated, prearranged, affiliate block transactions at issue in this case.  When the CFTC complains that RBC's trades were "not made on the basis of supply and demand factors," for example, it fails (or refuses) to apprehend that block trading, by its nature, does not turn on the "supply and demand factors" in the open market.  Likewise, the CFTC contends that the trades were "artificial" because "the profits and losses that accrued to the RBC counterparties to the trades netted to zero when they were consolidated in RBC's overall profits and losses." Only if affiliate block trading is *per se* unlawful does this assertion have traction.  Again, *all* affiliate block trades "net to zero" from the parent's perspective.  The CFTC does not and cannot support the assertion that affiliate block trading is prohibited, and its Motion therefore fails.

There was nothing "fictitious" about the SSF and NBI trades, and no marketplace participants were led to believe that the trades were anything other than privately negotiated block transactions pursuant to Rule 417.  Each trade had independent economic consequences, with risk for and impact on each counterparty.  The CFTC has cited no case in which a fictitious

14

sale charge has been brought regarding an exchange-permitted block trade since the Commission

began allowing block trades in 1999.  Rather, fictitious-sale cases since 1999 involve unlawful

prearranged or noncompetitive trades, and they have no relevance to the block trades here.

Moreover, as noted, there can be no Section 4c(a) violation – for either fictitious or wash sales –

if the participant in the trade "in fact believes he is bargaining faithfully and intends to effect a

bona fide trade." *Reddy*, 191 F.3d at 119 (quoting *Savage*, 611 F.2d at 284).

IV. **DISPUTED ISSUES OF FACT REMAIN CONCERNING RBC'S *STOLLER*
DEFENSE, PRECLUDING SUMMARY JUDGMENT ON COUNT I.**

A. ***Stoller* provides an independent basis to deny the Motion, based on RBC's
lack of notice that the CFTC no longer considers affiliate block trades to be
bona fide transactions.**

In *Stoller*, the Second Circuit delivered a stern rebuke to CFTC efforts to enforce an

unannounced interpretation of the wash sale prohibition without providing sufficient notice of

that new interpretation.  Recognizing that Section 4c of the CEA is imprecise (at best) and the

meaning of a prohibited "wash sale" is undefined, the Second Circuit held that lack of notice is

an "incurable defect" to a CFTC enforcement action, given the intent required.  *Stoller*, 834 F.2d

at 265.

Specifically, the CFTC attempted in *Stoller* to enforce an otherwise unannounced

position that an industry practice known as a "roll-forward" trade was a wash sale.  *Id.* at 265-66.

Because the "essential and identifying characteristic of a wash sale seems to be the intent not to

make a genuine, *bona fide* trading transaction," the CFTC conceded that it needed to

"demonstrate that respondent knowingly participated in transactions initiated with the intent to

avoid a bona fide market position." *Id.* at 265 (citation omitted).  The Second Circuit held that

the CFTC could not announce via an enforcement complaint a new standard for a "bona fide"

transaction (taken out of context from factually distinguishable cases) and then "charge a knowing violation of that revised standard." *Id.* at 265-66.

In addition to undercutting the CFTC's ability to show scienter, *Stoller* provides an independent affirmative defense – lack of fair notice – that is consistent with the "fundamental principle in our legal system" of due process, which mandates that "laws which regulate persons or entities give fair notice of the conduct that is forbidden or required." *FCC v. Fox Tele. Stations, Inc.,* 132 S. Ct. 2307, 2317 (2012).[7] The CFTC cannot seem to comprehend that this affirmative defense is not based on principles of estoppel or waiver.

Even more than in *Stoller*, the CFTC here has sought to enforce a previously unannounced rule. Indeed, it is attempting to apply an incorrect legal standard that does not and cannot apply to these facts. In 2005, when RBC provided detailed information to the CFTC, CME and OneChicago showing that its affiliates intended to trade futures on a non-competitive basis, discussing how those trades would be priced, and describing sample transactions, neither the CFTC nor CME rejected the proposed strategy out of hand. To the contrary, the potential wash sale issue was identified by CME and RBC and addressed before the trading ever commenced; thereafter, both RBC and the two regulators assessed the trades in the context of the CFTC's proposed 2004 guidance on affiliate block trading. (RBC-SOF ¶¶ A5-A7.) Each of the regulators allowed the trades to go forward. Nothing about that past practice is consistent with the new position the CFTC takes in this case.

---

[7] *Stoller* is not an outlier. In addition to *Stoller*, other Second Circuit cases that have applied the fair notice defense to bar enforcement of government actions include *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (overturning sanction imposed "pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public") and *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 184 (2d Cir. 1976) (revising and limiting SEC sanctions where violations occurred during "years of considerable uncertainty as to the regulatory climate concerning [the violation]").

It is unclear exactly what standard the CFTC *is* applying to affiliate block trades; the CFTC applies inapposite case law and alleges in conclusory fashion that RBC "traded with itself." RBC is left to wonder whether the CFTC is applying traditional veil-piercing principles, the arm's length standard from its 2004 proposed guidance, the rules from its 2008 proposed guidance, or some other standard. The CFTC has refused to pin itself down and will only state that its prior proposed guidance is irrelevant. What is clear, however, is that the CFTC's current position on affiliate block trading is unannounced, novel, and inconsistent with what came before.

### B.   *Stoller* is not distinguishable and presents factual disputes regarding notice that cannot be resolved on summary judgment.

The CFTC argued in its Educational Brief that *Stoller* is distinguishable because RBC had fair notice that wash sales were prohibited by Section 4c. But Stoller had the same notice. The issue in *Stoller* was lack of notice that *roll-forward trades* were not considered bona fide. And the issue here is lack of notice that *affiliate block trades* are not considered bona fide. The CFTC's assertion here that it is relying only on the traditional definition of a wash sale in prosecuting this action misses the point. As it did in *Stoller*, the CFTC is now *applying* that traditional definition to affiliate block trading in a novel (and incorrect) fashion, by taking legal standards out of context from factually distinguishable cases. *Stoller*, 834 F.2d at 266-67.

The CEA does not prohibit affiliate block trades, and the CFTC has never informed market participants that it believes affiliate block trades are improper. To the contrary, in 2004 it rejected a "presumption of illegitimacy" for these transactions and has approved exchange rules for their execution. The CFTC has argued that RBC had constructive notice of its litigation position from previous wash sale decisions concerning transactions that were "virtually risk-free, often prearranged, and designed to mislead [market participants into believing that the trades had

actually been submitted to the open market].”  (CFTC Educ. Br. at 11 (citing *Stoller*, 834 F.2d at 266)).  But RBC could certainly have “well believe[d]” that those decisions were factually distinguishable, particularly because block trades are *always* prearranged.  *Stoller*, 834 F.2d at 266.  RBC could not have predicted that the CFTC would apply the legal framework for open-market trading to the inherently, and lawfully, non-competitive environment of affiliate block trading.

In addition to the CFTC's incomprehensible (and incorrect) legal theory, the foregoing considerations present, at a minimum, genuine issues of material fact.  Accordingly, summary judgment on Count I should be denied.

## V.     RBC MADE NO FALSE STATEMENTS OR OMISSIONS TO CME ABOUT BLOCK FUTURES TRADING BETWEEN RBC AFFILIATES (COUNT III).

The CFTC alleges that RBC made false or misleading statements in letters to CME in October and November of 2005.  That allegation is itself wrong, and the evidence invoked to support it has been repeatedly distorted and taken out of context.  At a minimum, the allegations regarding the statements at issue are false, inherently subjective, and susceptible to reasonable disputes about their meaning and purposes.  Those issues must be resolved by the trier of fact. *See, e.g., Patrick,* 745 F.2d at 159-160.

As an initial matter, the CFTC's entire discussion of alleged false statements suffers from the same foundational flaw as the rest of its case.  The CFTC contends that RBC's alleged misstatements thwarted CME's inquiry into whether block trades between RBC affiliates on the OneChicago Exchange were “open” and “competitive.” As already noted, however, block trading is, by definition, neither open nor competitive.  Even if the CFTC does not accept that now, the CME understood it back in 2005.  (RBC-SOF ¶ R39; RBC-SOF ¶ A4.)  The focus of CME's inquiry was not “openness” and “competitiveness.”  It was separateness – that is, whether

the RBC affiliates conducted the trades at arm's length, consistent with the CFTC's 2004 proposed guidance. That focus is fundamentally different than what the Motion suggests, and the CFTC's arguments are therefore based on a misguided premise.

The CFTC's legal error alone renders the entire discussion of RBC's alleged false statements irrelevant, for the alleged statements necessarily were immaterial to the appropriate legal analysis. In any event, RBC's letters to CME were not false or misleading in the first place.[8]

### A.    RBC's October 18, 2005 response to CME was not false or misleading.

#### 1.    RBC did not have or conceal an intent to exclude competition from non-RBC firms.

The CFTC contends that, in the October 2005 letter, RBC concealed an intention to "exclude competition from non-RBC related firms" and "exclude competition from non-RBC entities from its SSF trades." As evidence of that intention, the Motion identifies two sentences that were not included in the final version of the October letter:

> Like all other financial groups, RBC Financial Group will not outsource transactions to third party purveyors of financial services if these can be executed more cost efficiently internally. For this reason, the other side of RBC (Canadian Transit's) SSFs written on Canadian equities will normally be taken by the group's UK licensed bank, RBCEL…

(CFTC Br. at 20.)    From these two sentences, the CFTC concludes that RBC (a) intended to "exclude competition from non-RBC related firms," and (b) concealed that fact from the CME. *Id.*

The CFTC's argument strains credulity. First, the two sentences were proposed by an unknown employee who had been provided a draft letter, and there is no evidence regarding the

---

[8] For convenience, attached to this brief as Appendix A is a short form table that sets forth and summarily refutes each of the alleged false statements or omissions. The full refutation of the CFTC's position is set forth in this brief and RBC's accompanying Rule 56.1 statements.

basis for those comments.  (RBC-SOF ¶¶ R59, R62, R63.) The author did not include them in the letter because, among other things, they were not responsive to the questions asked.  (RBC-SOF ¶ R62.)

Second, the CFTC misrepresents what the draft sentences say.  They do not state that RBC intended categorically to exclude competitors.  Rather, the language in question declares a preference to trade among RBC affiliates *if* such trades can be executed efficiently, and the expectation that such trades will *normally* be taken by an affiliate.  It may rhetorically suit the CFTC's case to read these qualifiers out of existence, but the qualifiers existed nonetheless. They contradict the Motion's implication that RBC had an "avowed intent to exclude non-RBC affiliated counterparties from its SSF trades."  (CFTC Br. 21.)   And they establish, at a minimum, a material factual question that cannot be resolved through summary judgment.

Third, the record clearly shows that RBC did not conceal the substance of what the two draft sentences *actually* say.  Every relevant player – RBC, CME, OneChicago, the CFTC – absolutely knew that RBC's trading strategy involved, at its core, *affiliate* block trading.  That was the entire thrust of and reason for the CME's inquiry.  The CME's September 2005 questions for RBC, to which RBC responded in the October letter, expressly concerned only "block and EFP trading *conducted by corporate affiliates of RBC* … in single stock futures securities products at [OneChicago]."  (RBC-SOF ¶ A3) (emphasis added).  The CME and CFTC understood that RBC would naturally select the best available market for its transactions – and understood that, as reflected in the CFTC's own notes from 2005, "CMA and Bahamas make [the] best available market for each other."  (RBC-SOF ¶ A19; RBC-SOF ¶ R63.)  As the CME explained, "…it's incongruous that they would solicit a third party to do the trade… because they

wouldn't be able to capture the whole value of the trade, that the value to CMA and the value to Bahamas represented."  (RBC-SOF ¶¶ A19, A45; RBC-SOF ¶ R63.)

Nor was it secret, in October 2005, that "normally" the other side of RBC SSFs would be taken by an affiliate.  CME knew that "the most common usage of SSFs to date involves the transaction of block trades and EFPs between two different/independent RBC entities."  (RBC-SOF ¶ A20; RBC-SOF ¶ R62.)  And CME also knew that "*typically*, two different RBC entities … will seek to transact block trades … on the OneChicago exchange." (RBC-SOF ¶ A21; RBC-SOF ¶ 62) (emphasis added).  Indeed, for years RBC block trades made up a significant portion of all open volume on OneChicago, as both CME and the CFTC were well aware.  (RBC-SOF ¶ A22.)

CME also was well aware that in 2005 RBC's ability to arrange third-party block trades was limited.  As the testimony made clear, RBC conducted only a "handful" of SSF trades with non-RBC counterparties because "in general the [SSF] volumes [were] very, very light to non-existent," and for years there was no electronic market on the exchange to set up EFPs and block trades with other market participants.  (RBC-SOF ¶ A23; RBC-SOF ¶ R62.)  As the CME's Eric Wolff noted in his testimony, it was impractical early on for RBC to find other counterparties because the "nature of OneChicago trading at that time … prior to the existence of the BETS system that they use today, did not provide for any vehicle for which one could … shop a strategy."  (RBC-SOF ¶ A24; RBC-SOF ¶ R62.)  RBC did not, in short, conceal from anyone its intention and expectation generally to conduct trading among its affiliates.  That fact was widely understood, and it was the very premise of the CME's inquiry.

**2.    RBC did not misrepresent how it believed its affiliate block trading complied with the CFTC's arm's length criteria.**

The CFTC identifies only two other paragraphs from the October letter as allegedly misleading.  (CFTC Br. at 21.)   Both explain RBC's belief that it satisfied Core Principle 9 because RBC met the arm's length criteria set forth in the CFTC's 2004 proposed guidance on affiliate block trading – inasmuch as the trading affiliates were part of an arm's length organization structure, used separate account controllers, and effected the SSF trades during market hours.   The CFTC contends that these responses omitted "information about who controlled RBC's SSF strategy" and "concealed RBC's avowed intent to exclude non-RBC affiliated counterparties from its SSF trades." Neither contention holds water.

The accusation that RBC concealed who controlled trading is baseless.  RBC truthfully explained who controlled the trades at issue: they were separate account controllers, each responsible for reviewing and evaluating the terms and conditions, and the potential risks and benefits, of the prospective transactions.  (RBC-SOF ¶ A26.)  The account controllers traded on behalf of affiliates with "arm's length organizational structures" and separate balance sheets, income statements, P&L statements, and tax returns.  (RBC-SOF ¶ A27.)  The testimony of the separate account controllers confirms that Mr. Rosenbaum did not, contrary to the CFTC's assertion, control their trading.  (RBC-SOF ¶ A43.)

The contention that RBC concealed some intent to exclude non-affiliated counterparties makes no sense at all in the context of RBC's October letter.  The topic of trading with non-RBC counterparties was irrelevant to the question RBC was asked to address, which focused on whether its affiliate block trading complied with the arm's length criteria in the proposed guidance.  RBC was not asked, directly or implicitly, whether it would trade with non-affiliate counterparties, and nothing was concealed.

**B.     RBC's November 17, 2005 response to the CME's follow-up questions was not false or misleading.**

On October 26, 2005, the CME asked certain follow-up questions of RBC regarding its affiliate block trading.  The questions at issue now, which were asked by the CME solely at the request of the CFTC, had a different focus than the CME's previous inquiries.  Specifically, the CME's October 26, 2005 questions asked whether the block trading strategy "originate[d] at the corporate level," whether the affiliates "had attempted to solicit other parties besides RBC to conduct OneChicago block trades," and whether it was "possible that non-RBC entities might be involved in such block trades in the future." RBC responded by letter dated November 17, 2005. The CFTC has alleged RBC's responses in the November letter were false statements.  None were.

**1.     RBC did not make false statements to CME about how the idea of SSF trading originated.**

One of the CME's follow-up questions asked the following:

> How [did] RBC CMA and RBC (Bahamas Branch) … initially [find] each other to conduct the block trades – did the affiliates independently come up with the idea and strategies to trade, or did the idea/originate at the corporate level?

(RBC-SOF ¶¶ R43, R69.)  RBC provided a five-sentence paragraph in response, but the CFTC focuses on – and quotes – only the first two sentences.  The complete response is:

> The idea of engaging in OneChicago single stock futures block transactions originated with staff in our Bahamas office.  The decision to engage in the block transactions was then made between the RBC affiliates involved in the transactions (primarily RBC (Bahamas Branch) and CMA) after discussions between them.  Before any trades were executed, the single stock futures trading strategy was discussed with senior managers within the Capital Markets platform of RBC to confirm that they understood and supported the single stock futures block trading strategy.  As noted in my October 18 letter, the single stock futures strategy essentially built upon a trading strategy involving swaps that had previously been utilized by RBC (Bahamas Branch) with other RBC entities, including CMA and RBCEL.  That strategy was developed by RBC (Bahamas Branch) in conjunction with senior managers in the RBC Capital Markets platform, as well as CMA and RBCEL trading personnel.

23

(RBC-SOF ¶ R44.)  Isolating the first two sentences from the rest of the response, the CFTC alleges they were misleading because Dan Rosenbaum, one of the two Bahamas staff members to which RBC was referring, was located in London at the time he conceived of the trading strategy; and because, in the CFTC's view, Mr. Rosenbaum held a "corporate-level" position.

The CFTC seeks to manufacture a false statement where none existed.  In its October letter, RBC identified Mr. Rosenbaum as the Bahamas account controller, *i.e.*, a member of Bahamas staff, which is the position he held at the time of RBC's November letter.  (RBC-SOF ¶¶ A28-A30.)  Mr. Rosenbaum had worked for the Bahamas since at least 2004, and he relocated to the Bahamas from London in April 2005, which was shortly after the idea of using SSF contracts originated.  *Id*.  Before Mr. Rosenbaum moved to the Bahamas, he and his supervisor were planning his move and working on trading strategies to deploy from the Bahamas.  *Id*.  None of this is in dispute, and none of it renders RBC's statement false or misleading as the CFTC contends.

Equally off the mark is the CFTC's contention that Mr. Rosenbaum held a "corporate level" position when he conceived of the trading strategy, thus rendering false RBC's statement that the strategy originated at the Bahamas staff level.  The "corporate level" at RBC is the senior management of the Bank as a whole.  Mr. Rosenbaum did not hold a senior management position in the Bank.  Contrary to the impression left by the CFTC, he was not a managing director of RBC.  (RBC-SOF ¶¶ A31, A32.)  He was, rather, a Managing Director in the Capital Markets business, which is only one of five major lines of business of the Bank.  The ideas and strategies involved in this case did not originate at the corporate level of RBC but rather were developed by senior staff within the Global Arbitrage & Trading platform, which at the relevant time was a subdivision of Global Markets, which was a subdivision of Capital Markets.  (RBC-SOF ¶ A33.)

In any case, RBC's complete November 18, 2005 response – omitted by the CFTC in its Motion – clearly and accurately stated that the idea for SSF block trading on OneChicago had been vetted and approved by senior management in the Capital Markets business platform. (RBC-SOF ¶ A33.)  RBC, thus, did not conceal that affiliate block trading in SSF had been discussed with senior managers in the RBC Capital Markets platform, or that senior managers "supported the single stock block futures trading strategy."  (RBC-SOF ¶ R44; RBC-SOF ¶ A33.)

Lastly, on the question of how the trading affiliates "found each other," the November 2005 letter accurately disclosed that Mr. Rosenbaum's idea for SSF trading was based *on a pre-existing strategy of inter-affiliate trading* using swaps rather than SSFs.  (RBC-SOF ¶ A34.) That broader strategy had been developed, as RBC disclosed, in conjunction with senior managers in the Capital Markets platform and Bahamas and CMA trading personnel.  *Id*.  As a result, the affiliates did not need to find each other independently to conduct SSF block trades; they had already been using the same strategy with different products.  Thus, the affiliates did exactly what RBC described: They decided to engage in the block transactions after discussion between them.  *Id.*

### 2.    RBC did not make false statements to CME regarding the future possibility of trading with non-RBC affiliated counterparties.

The issue of whether any RBC entity would block trade with non-RBC affiliated counterparties in the future had not previously been the subject of the CME's inquiry.  The issue was the subject of three follow-up questions.

First, the CME asked RBC, in part, "Have the [RBC] affiliates ever attempted to solicit other parties besides RBC entities to conduct OneChicago block trades?" *Id.*  RBC responded, in part, that "the RBC entities have tried, with only very limited success, to conduct OneChicago

block trades with non-RBC entities." The CFTC alleges that this response was misleading, viewing as conclusive an internal email from Ed McBride commenting on a draft of the response that this sentence "misleads as to our effort to engage other parties to take the other side of SSF trades w[ith] cma." (RBC-SOF ¶ R48.)

What the CFTC does not mention, however, is that Mr. Rosenbaum – in the very same email chain – responds to and expressly *disagrees* with Mr. McBride's concern that the preliminary draft response could "mislead." Mr. Rosenbaum concludes that RBC's draft answer is "not inaccurate." (RBC-SOF ¶ R48.) Instead, Mr. Rosenbaum explains that the answer is "possibly incomplete" because, although RBC had in fact spoken to other counterparties who were concerned about liquidity and pricing, RBC had not "actively marketed the product to other firms…" (RBC-SOF ¶ R48.) Following this exchange, RBC edited its draft response in an effort to address Mr. McBride's concern and make the final response more complete. (*Id.*) Specifically, in the final response, RBC specified exactly how it "tried" to conduct block trades by adding to the draft response the qualification that it had merely "spoken with several other firms" rather than, by omission, implying that it had engaged in active marketing. (*Id.*) These revisions made the final response complete and not misleading.[9]

The CFTC also fails to acknowledge that Mr. McBride, as the account controller for CMA, was explicitly limiting his response to a description of the efforts *by CMA,* and not by any other RBC entity. (RBC-SOF ¶ R48.) In fact, the CFTC does worse than that: It substitutes the word "RBC" for "our" in Mr. McBride's statement ("misleads as to *our* effort to engage other

---

[9] RBC noted that it "had spoken with several other firms about trading on OneChicago, but concerns about liquidity and pricing have inhibited interest" (RBC-SOF ¶ A25.) The CFTC does not dispute that RBC spoke with other firms about trading SSFs on OneChicago, but it argues that those firms were not, contrary to the evidence, inhibited by liquidity and pricing concerns. (CFTC Br. at 15.) The CFTC offers no support for that assertion.

parties to take the other side of SSF trades w[ith] cma"), thereby deliberately conveying the erroneous impression that Mr. McBride was speaking on behalf of RBC as whole. Mr. Rosenbaum's follow-up e-mail made clear that the draft response was not misleading, taking into consideration the efforts of other parts of RBC.  (RBC-SOF ¶ R48.)  The overall efforts to engage third parties were accurately characterized in the preliminary and final draft.  (RBC-SOF ¶ A35; RBC-SOF ¶ R48.)

Second, the CME asked RBC whether it was "possible that non-RBC entities might be involved in the future." (RBC-SOF ¶ R48.) RBC responded, in part, that "[w]e are very enthusiastic about the OneChicago Exchange single stock futures market, and the possibility that additional participants will be attracted to the market."  (RBC-SOF ¶ R48.)  The CFTC contends this response was false, but that allegation is squarely rebutted by the evidence.  At the same time RBC provided this response, it was seriously exploring making a substantial investment in OneChicago – precisely because RBC was optimistic (*i.e.*, "enthusiastic") about the potential growth of the OneChicago SSF market and its attractiveness to other market participants.

Specifically, RBC was considering investing $10 million in OneChicago through the purchase of an approximate 20% interest.  These were not idle or casual discussions.  OneChicago had retained a financial adviser for the transaction and prepared a letter of intent.  (RBC-SOF ¶¶ A36, A37.)  OneChicago also provided to RBC third-party projections concerning OneChicago's growth.  (RBC-SOF ¶ A38.)  Those projections forecasted dramatic growth over the next four years and described the advantages of securities futures products traded on OneChicago.  Even if there were no other evidence of RBC's enthusiasm for the OneChicago SSF market, common sense alone dictates that reasonable investors would not put $10 million into a business about which they were unenthusiastic.

In any case, RBC's statements of *enthusiasm* about the future of OneChicago's SSF market and the possibility of additional market participants are not statements of present or historical fact, but rather subjective statements of optimism about the future.  As a "general proposition, statements of optimism alone (*i.e.,* 'puffery') are not material." Prohibition of Market Manipulation, [CFTC Notice of Proposed Rulemaking], 75 Fed. Reg. 67,657, 67,660 (Nov. 3, 2010); *see also Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir. 1994) ("misguided optimism is not a cause of action, and does not support an inference of fraud").

Moreover, the CME was well aware of RBC's possible investment in OneChicago, and the author of the November letter spoke to the CME's Eric Wolff about whether to mention in the November letter that possible investment and how the possible investment impacted trading. (RBC-SOF ¶ A39; RBC-SOF ¶ R56.)  Mr. Wolff advised that the November letter should not reference the possible investment so that 'business" and "compliance" issues would be separate. (RBC-SOF ¶ A40; RBC-SOF ¶ R56.)  Thus, although the November letter did not address the possible investment in OneChicago and Mr. Rosenbaum's comments about the impact on soliciting third parties, the CME knew of the situation.

Third, another part of the CME's follow-up questions asked, "Is it possible that non-RBC entities might be involved in such block trades in the future?"  (RBC-SOF ¶¶ R41, R48.)  RBC responded that, "with … broadened participation, we have every reason to believe that we would effect business with a wide range of transaction counterparties."  The CFTC contends this was false.  It was not.  RBC's response reflected the bank's experience in every other organized market with broad participation.  (RBC-SOF ¶ R48; RBC-SOF ¶ A41.) As RBC testimony confirmed, "if there is a liquid market there wouldn't be benefit to … just internalizing trading. We would look to trade with a wide range of transaction counterparties."  (RBC-SOF ¶ A41.)

As it turned out, the SSF market did not expand as RBC had envisioned. Consequently, RBC did not trade with a range of counterparties, as those institutional market participants never materialized. (RBC-SOF ¶ A42.) The fact that RBC's expectation of a liquid market did not materialize does not mean that its stated expectation of doing business with other counterparties, should such a market come to pass, was false or misleading at the time they were made. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 108-09 (2d Cir. 2011) (subjective opinion false or misleading only if not genuinely held in good faith by the speaker). RBC answered the question posed by the CME with the truth as it knew it to be in November 2005, and as confirmed by its contemporaneous conduct.

### C.    Any alleged errors in RBC's statements to CME were immaterial and could not have thwarted CME's inquiry into RBC's affiliate block trading.

The essential elements of a Section 9(a)(4) violation are: (1) willfully (2) concealing, or making a false statement of (3) a material fact (4) to a registered entity, board of trade, or futures association. *Matter of EMF Fin. Prod.*, Comm. Fut. L. Rep. (CCH) ¶31,441 (CFTC Nov. 13, 2009); *CFTC v. ISB Clearing Corp.*, No. 03-CV-9127 (GBD), 2006 WL 5266749, at *2 (S.D.N.Y. Nov. 7, 2006). In each case where a Section 9(a)(4) violation was found, the statements were material. *See, e.g., ISB Clearing Corp.*, 2006 WL 5266749, at *2 (finding a violation of 9(a)(4) for filing a report containing materially false information). As the CFTC's cases discuss, "false statements issued to cover up illicit activities can prevent [a futures exchange] from carrying out its enforcement duties if it relies on those statements" or if they otherwise "thwart [the] investigation of [] trading activities." *CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 535-36 (S.D.N.Y. 2008).

The CFTC acknowledges the materiality requirement for a Section 9(a)(4) claim but then argues that case law interpreting a similar statute reduces materiality to a foregone conclusion.

That is not correct.  Even under the most lenient standards for materiality, a jury must find that an alleged false statement had the "potential to mislead [] *on some significant matter.*" *United States v. Kwiat*, 817 F.2d 440, 445 (1987) (emphasis added).

Here, the two issues on which the CFTC generally alleges RBC misled the CME were not material to the CME's inquiry.  First, as discussed above, no one "higher up" controlled the account controllers' trade-by-trade decision making.  And even if there had been a directive from "higher up," the CME's contemporaneous analysis of the issue reveals that that issue was irrelevant: the CME believed that the "trades are proper even [if] directed by a higher up, since they are based on a 'fair contemporaneous price' in the cash market and thus are arms-length." (RBC-SOF ¶ A44.)  The origin of the trading strategy was not material to, and therefore could not have thwarted, the CME's inquiry into RBC's affiliate block trading.

Second, RBC's efforts to conduct trades with third-parties were not relevant to CME's inquiry and could not have thwarted its investigation.  CME knew that there was virtually no third-party market at the time, and it knew that, in any case, "…it's incongruous that they [RBC] would solicit a third party to do the trade."  (RBC-SOF ¶ A45.)  In any event, neither existing law nor the CFTC's pending proposed guidance on that law conditioned the permissibility of block trading on efforts to solicit third parties to participate in those privately negotiated, prearranged transactions.  Thus, information on this issue had no relevance and was not material to the CME's inquiry into whether RBC's affiliate block trades were arm's length transactions.

> **D.    None of the alleged errors in RBC's statements to CME, even if proven, show RBC engaged in willful misrepresentation.**

The limited case law addressing Section 9(a)(4) confirms that it applies only to willfully fraudulent conduct, as the CFTC acknowledges.  *See, e.g., Matter of McMahan*, Comm. Fut. L. Rep. (CCH) ¶ 31,662, 2010 WL 4491884, at **9-14 (CFTC Nov. 5, 2010) (analyzing scienter

under similar provisions of Section 9 and concluding "'the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity.'")[10]

Accordingly, the CFTC must prove that RBC willfully made false statements to CME. The evidence does not even show that RBC's statements were false, for all of the reasons already noted.  Aside from the issue of falsity, though, the question of willfulness requires the jury to "sojourn into [a defendant's] mind-set," which "will inevitably trigger myriad factual inferences, as to which reasonable persons might differ in their resolution." *Patrick,* 745 F.2d at 160.  "The need for a full exposition of facts is profound under such circumstances since determining a man's state of mind is 'an awesome problem,' capable of resolution only by reference to a panoply of subjective factors" including demeanor and credibility.  *Id.*  Particularly because the author of the RBC letters at issue has testified and submitted an affidavit categorically denying any willfulness, summary judgment is especially inappropriate in this case.

## VI.     THE CFTC'S FALSE STATEMENT CLAIM IS TIME-BARRED.

Count III is subject to a five-year statute of limitations that cannot be extended by a discovery rule.  *Gabelli v. SEC*, 133 S. Ct. 1216 (2013).  Because Count III is time-barred and insufficient as a matter of law, RBC has separately filed a motion for summary judgment on that claim.  The motion provides an independent basis to deny the CFTC's Motion for summary judgment as to Count III.

---

[10] To the extent the Motion attempts to conflate "willful" with "negligent," the law makes clear there is no such thing as negligent fraud under Section 9(a)(4). *Kearney v. Prudential-Bache Securities Inc.,* 701 F. Supp. 416, 428 (S.D.N.Y. 1988). As courts in this district have noted, the language of the CEA "does not use sweeping terms" and its "pejoratives are simple and pointed: it uses the words 'cheat' and 'defraud' and 'willfully'…" *Id.* "This language would seem to preclude a negligence claim and instead require a scienter or intent-based standard …" *Id.*

# VII.   CONCLUSION

For all the foregoing reasons, the CFTC's allegations of false statements and fictitious wash trading in Counts I and III are meritless.  At a minimum, those allegations are subject to genuine factual and legal dispute based on the record evidence assembled in this case.  Summary judgment on Counts I and III should be denied.

Dated: August 18, 2014.
   New York, New York

Respectfully submitted,

KATTEN MUCHIN ROSENMAN LLP

By:    /s/ Ted S. Helwig

Arthur W. Hahn, *pro hac vice*
(arthur.hahn@kattenlaw.com)
Ted S. Helwig, *pro hac vice*
(ted.helwig@kattenlaw.com)
Gil M. Soffer, *pro hac vice*
(gil.soffer@kattenlaw.com),
Katten Muchin Rosenman LLP
525 West Monroe Street, Suite 1600
Chicago, IL 60661
Tel: (312) 902-5200
Fax: (212) 902-1061

William M. Regan (WR-7795)
(william.regan@kattenlaw.com)
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
Tel:  (212) 940-8800
Fax:  (212) 940-8776

*Attorneys for Royal Bank of Canada*

## <u>CERTIFICATE OF SERVICE</u>

I, Ted S. Helwig, hereby certify that on August 18, 2014, I caused a copy of the foregoing Response in Opposition to the CFTC's Motion for Partial Summary Judgment to be electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing documents are being served this day on all Counsel of Record via transmission of Notices of Electronic Filing generated by CM/ECF.

**Dated:**  August 18, 2014.

Respectfully Submitted,

By:     <u>/s/ Ted. S. Helwig</u>
         Katten Muchin Rosenman LLP
         525 W. Monroe St.
         Chicago, IL  60661
         312-902-5537
         312-902.1061 (fax)
         ted.helwig@kattenlaw.com